WATER POWER COMPANY V. J. B. BROWN, *et al.*

1. PLEADING; *Promissory Note; Principal and Surety.* A petition gave a copy of a promissory note, and alleged that plaintiffs were sureties and defendant the principal debtor, and that they were compelled to pay, and did pay, the amount due thereon to the holder. Upon the face of the paper, the plaintiffs appeared as principals, and defendant as guarantor. The petition alleged that the note so appeared, because the president of the principal debtor, the defendant, was absent at the time of its execution; that the note was a renewal simply of a prior note; and that the defendant, by its president, signed as guarantor as soon as he returned. *Held,* That neither the form of the paper nor the date at which it is signed

by the several parties prevents inquiry in an action between the parties liable thereon as to who is the principal debtor, and who are only sureties, and that the petition, otherwise sufficient, was not rendered defective by the explanation given of the form of the paper.

2. PROMISSORY NOTE, *Renewals of; Competent Evidence.* Where there have been several renewals of paper, it is competent to go back to the original inception of the indebtedness, and show who was then the principal debtor; and a mere change in the form of the paper at these renewals does not prove any change in the relations of the parties *inter sese,* and is a mere circumstance to be considered with others in determining who, in the last renewal, was really the beneficiary.

3. PRINCIPAL AND SURETY; *Pledge; Evidence.* One surety may be so much interested in the principal's obtaining the loan as to pledge his own property to the other sureties to induce them to sign the paper, and hence the mere fact that a pledge was made by one party does not prove that he is really the principal debtor; nor does such a pledge, without express contract therefor, release the principal from his implied contract to repay to the surety any sum he may have to pay by reason of his signing the paper.

4. REIMBURSEMENT OF SURETY, *Deposit for.* A deposit of bonds, made as expressed, to "reimburse" a surety, does not necessarily imply that the surety looks solely to the bonds for indemnity, and releases the principal from the implied obligation to protect him against loss by reason of signing the paper.

5. PRINCIPAL DEBTOR, *When Not Prejudiced.* Where bonds are deposited as indemnity by one surety for another, and the latter after payment of the notes takes the bonds and sells them, the principal is not prejudiced in an action to recover the balance when the court instructs the jury to credit the claim with the fair market value of such bonds, although such bonds were sold without notice to the principal or the depositor.

6. COMPETENT TESTIMONY; *No Error.* C. C. H. was president, general manager, and the owner of 496 out of 500 shares of the capital stock of defendant. W. E. H., his brother, was secretary, and owner of one share. In the absence of C. C. H. he acted as general manager. The two constituted a majority of the directors. They also composed the firm of C. C. H. & Co. The firm's name and the defendant's name were each on the paper. In an action against the defendant to charge it as principal, the following testimony was admitted : Statements of C. C. H. to one of the plaintiffs, made after the maturity of the note, and while seeking to induce plaintiff to renew or protect the paper; directions of C. C. H. and W. E. H. to one in the employ of both defendant and the firm to make out a list of defendant's indebtedness for their use in negotiating a sale of the property, and to include this note in that list; statements made by W. E. H. while showing this list to parties whom he was trying to induce to buy the property. Both C. C. H. and W. E. H. were witnesses at the trial, and the attention of the latter was called to

these statements; he admitted them, and gave such explanation thereof as he desired. *Held,* That under the circumstances of this case, no substantial wrong was done to the defendant in permitting this testimony to go to the jury.

### *Error from Reno District Court.*

ACTION brought by *J. B. Brown* and *L. A. Bigger,* partners as Brown & Bigger, and *E. Wilcox,* against *The Water Power Company,* a corporation organized and doing business under the laws of the state of Kansas, upon a certain promissory note, of which the following is a copy:

"$3,000.　　　　HUTCHINSON, KANSAS, Sept. 21, '77.

"Ninety days after date we promise to pay to the order of S. W. Campbell, cashier, three thousand dollars, for value received, negotiable and payable without defalcation or discount, to the Reno County State Bank of Hutchinson, Kansas, with interest at the rate of twelve per cent. per annum from maturity, and an attorney's fee to be taxed by the court, if judgment is recovered on this note.

"C. C. HUTCHINSON & CO.
"E. WILCOX.
"BROWN & BIGGER."

The note was indorsed as follows:

"Water Power Company, by C. C. Hutchinson, President. Demand, notice and protest waived, this Dec. 22d, 1877. Brown & Bigger.　Water Power Company, by W. E. Hutchinson, Sec'y.　　　　C. C. HUTCHINSON & CO.
"E. WILCOX."

The nature of the action, and the facts, sufficiently appear in the opinion. Trial at the April Term, 1879, of the district court, and judgment for the plaintiffs for $2,303.21, and costs. New trial denied, and the defendant brings the case to this court.

*Whiteside & Campbell,* and *A. L. Williams,* for plaintiff in error:

1. It will be noted that the petition does not even allege any authority for the act of C. C. Hutchinson, or that he signed for the corporation, by placing his name on the back of the note as "president," and it expressly states that the

signing for the corporation (if he did sign for it) was *after* the giving of the note. (20 Kas. 230; 42 Wis. 56.)

The allegation that the note was a renewal of one given by the Water Power company, does not help the matter, for in such case the plaintiffs below should have exhibited the note, alleged that it was properly executed by agents of the defendant duly authorized, and that they signed as sureties at the request of the defendant. In short, if their declaration herein is bad, they could only have gotten the benefit of the prior note by declaring on it and alleging that it was not paid by the new note. Besides, the Water Power company signed the prior note on the back only. (17 Ohio, 9.)

There is a variance between the allegations of the petition and the note exhibited, and between the pleadings and the evidence. (10 Kas. 144; 1 Gr. Ev., § 27; 10 Mo. 406; 32 id. 203; 26 id. 153.) But if the petition be good, the filing of the unverified general denial to the new matter set up in the answer estopped plaintiffs from introducing any evidence under the pleadings. (Nash's Pl. and Pr., 3d ed., 92; 7 Am. Law Reg., N. S., 777.)

2. But whatever may be the law as to the pleadings, the plaintiffs were estopped from recovering against the defendant; if not entirely, at least by their affidavit for an attachment. Sec. 191 of the civil code requires that a party applying for an order of attachment must state in his affidavit the *nature* of his claim. In this case the plaintiffs show in their affidavit for an order of attachment, that they were not creditors of this defendant. (20 Kas. 220.) Their affidavit was bad, and even though they are not wholly estopped, no judgment in attachment should have been rendered against the defendant.

The plaintiffs were estopped entirely by the contract made by C. C. Hutchinson & Co. with them when they deposited the gravel-road bonds. There was no ambiguity about the contract. The word "reimburse" has a perfectly certain and well-defined meaning, and the fact that the contract was signed only by C. C. Hutchinson & Co. makes it no less a

contract, for it was reduced to writing in Wilcox's store as the understanding of the parties, and the plaintiffs took the contract and deposited the same with S. W. Campbell, cashier, and afterward, by its authority, they took the bonds and converted them to their own use. The court erred in permitting the introduction of parol evidence to vary the terms of the contract. There was no ambiguity; there was no mistake or fraud; and even if there had been, the reply laid no foundation for proving the same, or in any manner changing the meaning of the written instrument. The plaintiffs placed it in the bank, and afterward drew and used the bonds without notice to any one. It does not avail them to say they took the bonds under that contract as *collateral*, for under it they could not take them as such. The court, by permitting them to testify, simply allowed them to make testimony in their own favor. That contract, and the acts of plaintiffs by virtue of its authority, should not only have conclusively proved that C. C. H. & Co. were principals on the note, but should have induced the court to have ruled out the testimony varying its terms and meaning, and to have charged the jury that if plaintiffs took it and placed it in S. W. Campbell's hands as their agent, and afterward drew by its authority, and took the bonds deposited for their reimbursement in case they paid the note exhibited, they could not recover. But the court refused to expound and construe the contract, as was its duty, (1 Gr. Ev., § 277; 2 id., §§ 277, 278; 47 Ill. 178; 66 id. 315,) but turned the whole matter over to the jury, with the instruction that the language of the contract was doubtful, and particularly the word "reimburse," and that they could put such construction on it as they saw fit from the evidence.

As to the introduction of parol evidence to vary the terms or interpret the language of written instruments, we submit the following authorities: 1 Johns. 192; 2 id. 531; 2 Sandf. 202; 1 Gr. Ev., § 275, note 3; 2 Ph. Ev., §§ 709, 711, 746, note 9; 3 id., § 291; 11 Johns. 201; 1 Cow. 249; 4 Kas. 159; 20 id. 230; 10 Wend. 218; 5 Sandf. 201.

3. If the bonds, which were negotiable instruments, were

deposited only as collateral, then the plaintiffs had no right to take them under the written contract, which is the only authority they claim for so doing. First, for the reason that the written contract does not state them as collateral; second, they belonged to C. C. H. & Co. But admitting, for the sake of argument, that the bonds were deposited as collateral for the Water Power company, had plaintiffs the right to sell them without notice to the owner or pledgor? (Edwards on Bailments, 2d ed., § 286.) See also Edwards on Bailments, §§ 293, 282, 285, 219, notes 2, 3; 5 Am. Law Reg. (O. S.) 368; 5 id. (N. S.) 249.

4. The court below overslaughed the limits laid down in 14 Kas. 273, and authorities there cited, in permitting plaintiffs to prove admissions of the agents of the corporation. In some courts it has been held that corporate admissions can be proved only by corporate acts. This court held in 14 Kas. 273, that only such admissions as were made during the act creating the liability, or making the trade, as a part of the *res gestæ*, could be proved. But in this cause the floodgates were let down, and whatever C. C. H. or W. E. H. may have said at any time or place, or under any circumstances, was permitted to be proved. The jury were literally overwhelmed with casual statements claimed to have been made long after the alleged contract. (5 Kas. 490.)

5. We advert to all that portion of the charge which says in substance that the jury may consider C. C. H. & Co. and the corporation one and the same, and the latter to be held for the liabilities of the former, and this, too, when the petition and reply nowhere make any allegation of identity, or mistake, or fraud, but on the contrary, draws a broad line of demarkation between the firm of C. C. H. & Co. and the corporation, and when the evidence shows that said firm and plaintiffs had long resided in the same city and done business with each other, and that the firm was in existence long before the organization of the Water Power company, and was still in existence, and that plaintiffs considered them separate and distinct. We have simply to say, that the spirit

of such instructions would destroy every corporation in the country. (18 Kas. 245; 5 Sandf. 201; Field on Corp., §197; 3 Am. Law Reg., N. S., 184; 13 id. 454.)

*Peck, Ryan & Johnson, A. R. Scheble,* and *W. H. Lewis,* for defendants in error:

1. As to the position of the plaintiffs (defendants in error), there is no dispute. It is admitted on all hands that they were mere sureties, who had signed the note out of the goodness of their hearts, to accommodate somebody. The plaintiffs say that that "somebody" was the defendant. The defendant (plaintiff in error) says it was C. C. Hutchinson & Co.

The plaintiff in error complains that the petition does not aver that C. C. Hutchinson, as president, had authority to sign for the corporation. The allegation is, that the corporation executed the note — not the president of it, nor C. C. Hutchinson individually, but the corporation itself, in its capacity as a legal entity. The averment that the corporation executed it, is an averment of all the ingredients of power and authority to do so. It will not be claimed that the corporation had not the general power to be a party to a promissory note. If the corporation has power to make a note, it will be presumed until the contrary is shown, that a note purporting to be made by it, was in fact made by it. (17 Ga. 574.) It is therefore not necessary to allege that it was authorized, for a legal presumption need never be pleaded. (18 Kas. 336.)

Plaintiff in error calls the attention of the court to a variance between the averments of the petition and the note attached as an exhibit, but does not state what the variance is. We presume it consists in the omission of the word "cashier," after "S. W. Campbell," in the petition. But a copy of the note is attached to the petition, marked "Exhibit A," and becomes a part of the petition, and correctly describes the note. Where an exhibit is filed with a pleading, it controls the averments of the pleading. The defendants were not misled, and there is no variance.

The plaintiff in error also complains that the reply filed to

its answer was not verified, and draws the conclusion by some strange process of reasoning, that the plaintiffs were thereby estopped "from introducing any evidence under the pleadings." Doubtless the execution of the paper mentioned in the answer is admitted by the failure of plaintiffs to deny it under oath.    There was no occasion to deny it, but on the contrary, they have always admitted it.

The averment in the petition that the Water Power company *executed* the note, includes every ingredient necessary to its execution, including the *authority* of the officer signing it to do so; and the answer, to raise an issue on the question of authority, should have been verified.    A denial of authority is one of the denials required by the code to be under oath.    When the petition alleges the execution of the note, it means execution, "with all that the term implies;" and it is, it seems to us, a palpable absurdity to say that the defendant, in its answer, can admit the *execution*, but deny the authority to execute it.    By not verifying the answer, the *execution* was certainly admitted.    But to admit the execution and deny the authority, is, in the same breath, to admit and deny the same thing.

2. Counsel for plaintiff in error claim that the plaintiffs below "were estopped from recovering against defendant; if not entirely, at least in attachment."    The reason for the estoppel is, that Brown, one of the plaintiffs, in his affidavit for attachment called the defendant a surety and C. C. Hutchinson & Co. principals.    The court will observe, however, that the affidavit distinctly avers that the claim was for money paid "for the use and benefit of said defendant."    If the court will examine the record, it will perceive that the attachment proceedings are not before the court for review.    No motion to dissolve the attachment appears, and its regularity and sufficiency are not questioned in any way.

Counsel further insist that plaintiffs were estopped "by the contract made by C. C. Hutchinson & Co. with them when they deposited the gravel-road bonds."    Now if there is any estoppel in relation to the deposit of these bonds, under the

paper annexed to defendant's answer, we venture to suggest
that it is the defendant that is estopped, not the plaintiffs;
because the defendant in its answer positively disclaims any
interest whatever in said bonds.    This is the averment in the
answer: "Defendant says that it had no right or interest
whatever in said road bonds; but they belonged solely to C.
C. Hutchinson & Co." The jury found from the evidence
that the defendant was the principal on the note, and prima-
rily liable for its payment.   C. C. Hutchinson & Co., who
put up the bonds, are not complaining of their disposal, and
it don't seem quite fair for the defendant to do so.    But con-
ceding that the Water Power company, as principal, is enti-
tled to all the benefits arising from the gravel-road bonds
which C. C. Hutchinson & Co. would be entitled to, let us
see what position the case takes.    In the first place, it is en-
tirely clear that the bonds were put up as a security to the
plaintiffs for the risk they took in signing the note.    The
theory that they were put up as absolute payment, is contrary
to the understanding of all the parties who had anything to
do with it, and is an absurdity on its face.    Defendants say
the word "reimburse" has a perfectly settled and well-defined
meaning.    It means to "repay," or "pay back;" but it
doesn't necessarily mean to pay back in full, nor that a per-
son taking property to "reimburse" him thereby surrenders
and loses all right to full payment.    The object of securities
and pledges of all kinds is to enable the pledgee to *reimburse*
himself for losses sustained or payments made, to the extent
of the value of the article pledged.    The proceeds of the
property pledged constitute a fund for the reimbursement of
the pledgee, but the thing pledged does not reimburse him.
The defendant's own witness, C. C. Hutchinson, himself tes-
tifies that the bonds were put in the hands of Campbell, for
the benefit of plaintiffs, "which *indemnified* them" for sign-
ing the note.    There is no doubt that this was the intention
of the parties; and beyond question it is the fair construction
of the instrument from its face. (5 Allen, 34.)

    3. Counsel also complain that plaintiffs did not proceed to

collect the bonds, instead of selling them, and claim that negotiable paper, when put up as collateral, cannot be sold, but must be collected by the pledgee; but we think counsel overlook the distinction between bonds and other negotiable paper. Bonds have usually a long time to run, and are bought and sold in the market like stocks. (Edwards on Bailments, §222.) Even a promissory note may be sold by the pledgee, if it has a long time to run. He need not wait to collect it. (5 Pa. Law Jour. Rep. 471; 21 Tex. 70.)

The plaintiffs therefore had a right to sell the bonds, and apply the proceeds in satisfaction of the debt to secure which they were put up. It is objected, however, that they sold them without notice to C. C. Hutchinson & Co.; but what right has the Water Power company to complain of the failure to give notice? The holders of collateral have a right to sell; the giving of notice is only a formality for the benefit of the pledgor, to insure a fair and *bona fide* sale. It may be waived by the pledgor, and in practice constantly is waived. The only persons who can complain of failure to give notice of the sale are C. C. Hutchinson & Co., the owners of the bonds. The Water Power company has no standing to object that C. C. Hutchinson & Co. were not fairly treated; but what damage have they sustained? The proof shows that a good price was obtained for the bonds; that the whole transaction was fair and honest, and that the amount obtained for the bonds was more than anyone could reasonably expect.

4. Plaintiff in error feels aggrieved that the court permitted the introduction of parol evidence to vary the terms of a written contract, by showing who was the principal on the note. The Water Power company appearing on the back of the note was *prima facie* a guarantor, and it is insisted that that presumption is conclusive, and cannot be contradicted. Undoubtedly there is a rule of evidence such as counsel assert, but undoubtedly it has no application to this case. Evidence to show who was principal and who surety on a note is not introduced to contradict or vary it, but to give it effect —to make it speak just what it means, and to lay its bur-

dens and obligations on the parties according to their true relations. The Water Power company, pointing to its signature on the back of the note, insists that we cannot "go behind the returns;" cannot show for whom we signed this note, who got the benefit of it, and who ought to pay it. Unfortunately, all the courts and all the books say we can. For instance, Brant on Suretyship, § 198, says: "If several parties sign a note as principals, and one of them pays it, he may sue the others for indemnity, and show by parol that they were principals and he a surety." Again, on the same page, he says: "So, where two or three parties who signed a note added to their names the word 'surety,' and one of them paid it, he may, in a suit of indemnity against the other, show that he was a principal, notwithstanding the addition of the word 'surety.'" 19 Martin (La.), 7 N. S. 588; 4 Zab. 812; 1 Kas. 445; 13 Gray, 403; 16 Ind. 236.

5. Counsel complain that the court below "overslaughed" the limits laid down in 14 Kas. 273, in permitting plaintiffs to prove admissions of the agents of the corporation.

The evidence complained of is, the statements made by C. C. Hutchinson and W. E. Hutchinson, as officers of the company, in enumerating its liabilities. They included this $3,000 note among the liabilities of the company. We think there can be no doubt of the admissibility of the testimony.

How is the liability of a corporation established? In two ways: First, by showing the execution of a contract; or, second, by showing the ratification of one. To show the original execution of the contract, admissions to be competent must be connected with the execution as part of the *res gestœ*. But how is the ratification shown? By showing that the corporation recognized it, and treated its liability as a valid and subsisting one. The *res gestœ* of a ratification or recognition is not a mere temporary event, but continues as long as the matter remains pending. During all that time the corporation is constantly ratifying and recognizing the liability. The statements of the officers were not introduced as a ratification in themselves, but as evidence showing a rati-

fication by the corporation. This case has many points of similarity to *Durham v. Carbon Coal and Mining Co.*, 22 Kas. 232.

But let us look a little further into this case, and see what the attitude of the plaintiff in error is. Both C. C. Hutchinson and W. E. Hutchinson were witnesses at the trial — the former by deposition, the latter in person. Mr. W. E. Hutchinson, when asked about these statements, admitted that he made them. In *Swenson v. Aultman*, 14 Kas. 273, the case which counsel say was "overslaughed," Mr. Justice VALENTINE remarked, "It does not seem from the record that the agent himself was examined as a witness on the trial." In this case, W. E. Hutchinson, who, as a high officer of the company, made the statements concerning its liabilities, comes upon the stand and admits that he made them. His story is an interesting one. He says:

"Before he [C. C. Hutchinson] left here we found we were so involved that we could not get out. . . . His idea was first to sell out part of the property. Afterward he expected to sell the property for enough to pay his debts, and have some money left himself. . . . We found it impossible to sell the mill property for anything like its value, or over and above its debts that were due. We tried to sell it for what was against the mill, and for what we owed in town, and not leave a dollar for the Water Power company [to pay]. We failed to make a sale with the men who were waiting here, and then *we saw the point*. We saw that the only way to get anything out of it was to put in all the accounts, so as *to make them believe* they were Water Power company debts, and sell for such debts. We put in the bank account of three thousand dollars that way."

Now it must be remembered that C. C. Hutchinson and W. E. Hutchinson were not merely inferior agents of the corporation. They were the president and secretary, the managers, the soul and body of the concern. Out of 500 shares, C. C. Hutchinson owned 496 shares — substantially all. W. E. was the partner of C. C. What they did and what they said relative to the corporate business had the weight of authority. W. E. Hutchinson is still president of the company,

but C. C. now writes "formerly of Kansas" after his name. The testimony of W. E. is unique. His explanation of how he "saw the point" is worthy of study as the effort of an artist of too much talent to be wasted on a water-power company. The jury heard him testify — heard all the testimony, and rendered its verdict. We submit that that verdict is not only warranted by the testimony, but was the only one which an honest jury could arrive at.

The opinion of the court was delivered by

BREWER, J.: This is an action brought by two of four parties, liable upon negotiable paper against one of the others, in which the plaintiffs claim that they were simply sureties, and the defendant the principal debtor, and that they had been compelled to pay and take up the paper, and that they seek to recover from the principal debtor the amount which they had paid for its benefit. Verdict and judgment were in their favor, and defendant alleges error.

The first question is, as to the sufficiency of the petition. It alleges the execution of the note by the various parties, that the defendant was in fact the principal debtor, and that the plaintiffs, though only sureties, were compelled to pay, and did pay and take up the note. The note, a copy of which is attached to the petition, reads as the joint promise of plaintiffs and C. C. Hutchinson & Co. to S. W. Campbell, cashier, and is indorsed, "Water Power company, by C. C. Hutchinson, president." The petition further alleges, that the note was thus prepared and signed by the three parties as apparently principals, and by the defendant as guarantor, for the reason that C. C. Hutchinson, the president, was not present when the same was given, and that he afterward signed the name of the company on the back of the paper, the same being simply a renewal of one before given by the company, with plaintiffs as sureties. We do not think this latter matter affects the sufficiency of the petition, or prevents inquiry into the true relations of the parties severally liable on the paper to each other. Whatever may be the rule as between them

and the holder, we understand that neither the form of the paper, nor the time at which the several signatures were affixed, prevents parol evidence as to who between themselves is principal, and who simply surety. (*Rose v. Madden*, 1 Kas. 445.) The objection to the petition was properly overruled. In this connection we may remark, in reply to a criticism as to the scope of the inquiry permitted by the trial court, that where there have been several renewals of paper it is competent to go back to the original inception of the indebtedness and show who then was the beneficiary of the loan, and that changes in the form of the paper at these renewals do not prove any change in the relations *inter sese* of the parties liable thereon. These changes are subject to explanation, and are simply like other facts to be considered in determining who is in fact the principal debtor, and who simply sureties. And as to the general scope of the testimony in this case, we cannot say that it was beyond proper limits. Some particular matters we may notice hereafter.

Defendant in its answer alleged that C. C. Hutchinson & Co. were the principal debtors, and that said Hutchinson & Co., to induce plaintiffs to sign as sureties, executed to them the following contract:

"HUTCHINSON, KANSAS, June 29, 1877.

*S. W. Campbell, Cashier:* This is to authorize you to hold in your possession the four thousand dollars of road bonds belonging to us which you have; and in case we fail to pay the $3,000 note due you, then the said bonds are to be turned over to E. Wilcox and Brown & Bigger, of this place, to reimburse them in case they pay said note. If they do not pay said note, that the said bonds are to be returned to us. They however agree to renew with us the said note, so long as the bank shall be willing to do so.

"C. C. HUTCHINSON & Co."

Plaintiffs, after paying the note, took the bonds, sold them, and applied the proceeds on their claim.

Defendant claims that this contract conclusively proves that C. C. Hutchinson & Co. were the principal debtors, and also that plaintiffs' sole recourse in case they were compelled to

44—23 KAS.

pay the note was on the bonds; that out of the bonds they were
to *reimburse* themselves, and that therefore they were to look
to them alone.   It also contends that the court should have
put this construction upon the contract as a matter of law,
and not left it to the jury to determine its meaning.   We can-
not agree with counsel in these views.   The contract does
not say that the debt is the debt of Hutchinson & Co.; neither
is there in its language anything inconsistent with the fact
that the defendant was, as to all the parties to the paper, the
principal debtor.   There is nothing strange in one of several
sureties being so much interested in the principal's securing
the loan as to offer his own property as collateral security to
the other sureties for the use of their credit, or to become
himself an additional principal as to them.   In this very case
it appears that C. C. Hutchinson & Co. owned 497 out of a
total of 500 shares in the capital stock of defendant.   Such
an interest in the defendant is ample reason for their personal
promises to their co-sureties, and the pledge of their private
property.   Indeed, the line of demarkation between the real
interests of defendant and C. C. Hutchinson & Co. is a little
shadowy; but whatever may be the reason therefor, a private
arrangement between co-sureties for the distribution of lia-
bility *inter sese*, does not, unless expressly so stipulated, re-
lease the liability of the common principal to them all.   Now
this contract does not imply or suggest such a release.   It
would be hard to construe it as even making Hutchinson &
Co. personally liable to plaintiffs in case of their payment of
the note.   It amounts to nothing more than a pledge of cer-
tain personal property belonging to Hutchinson & Co.
Neither can we regard this contract as estopping plaintiffs
from recourse upon the defendant, and for two reasons.   It is
no contract between plaintiffs and defendant, or to which the
latter is a party, and does not purport any release of the lat-
ter.   If it effects a release of anybody, it is of Hutchinson &
Co., and from a liability which they may have assumed to
plaintiffs to induce their signature.   Again, we do not think
the word "reimburse," as used in this connection, has that

excluding sense which counsel would give to it. Among the definitions of the word given by Webster, are "to pay back; to restore; to indemnify;" and the natural understanding of the expression would be, that to the extent of their value, the bonds were to indemnify plaintiffs against any payment which they might be compelled to make on the note. Suppose plaintiffs were compelled to pay but a hundred dollars on the note, could it be contended that they were entitled absolutely to the bonds, or that they had no interest in them because they had not paid the entire note? Such a contract must be construed in relation to the surrounding circumstances and the situation of the parties, and where words are used which may have two meanings, it is proper for the court to submit as a question of fact to the jury to determine the meaning in which they were used by the parties. Under the circumstances of this case, we can see but one answer which the jury could fairly have returned, and that is the one they did.

Counsel also complain that plaintiffs did not proceed to collect the bonds instead of selling them, and claim that negotiable paper, when put up as collateral, cannot be sold, but must be collected by the pledgee. But we think counsel overlook the distinction between bonds and other negotiable paper. Bonds have usually a long time to run, and are bought and sold in the market like stocks. Mr. Edwards, in his work on Bailments, (2d ed., § 222,) states the law thus:

"Negotiable notes, bills of exchange, and bonds issued by government or by private corporations, in a negotiable form, are usually pledged as collateral security, by a delivery of the instrument, so indorsed, where that is necessary, as to vest the title in the pledgee, and the circumstance that the title is in form transferred to the pledgee does not materially affect the contract of pledge. The pledgee takes the title in trust *to sell the bonds,* they being usually bought and sold like stocks, and to *collect the negotiable notes or bills* when they become due and apply the proceeds on the debt to secure which they were given."

It is very clear that stocks, when pledged as collateral, may

be sold—that being the only way to realize on them; and bonds are of so similar a character, that they are dealt with in the same manner when pledged as collateral.   The plaintiffs therefore had a right to sell the bonds and apply the proceeds in satisfaction of the debt to secure which they were put up.   It is objected, however, that they sold without giving notice.   To this, two answers may be given.   The defendant does not claim that the bonds belonged to or were pledged by it.   If improperly sold, the owners can recover for any loss sustained thereby.   Further, the court instructed the jury, that if the bonds were not sold for their market value, they should give the defendant credit for that value. So that even if the bonds belonged to it, there is no room for complaint.

We come now to that which is really the most serious question in the case, and that is the testimony admitted of declarations of the officers of the company made after the execution of the paper.   These group themselves into three classes: first, statements of the president to one of the plaintiffs made after the maturity of the paper, and in requesting him to protect it; second, statements of the president and secretary to one who was an employé of the company and of Hutchinson & Co. as to the debts he should include in a list he was by them directed to prepare for use by them in an attempted sale of the property; third, statements made by W. E. Hutchinson while either secretary or president—and we are not certain which—in connection with efforts to work up a company to buy defendant's property.

As to the first, there can be no serious question.   The statements were part of the *res gestæ;* they were made by the president while negotiating concerning this paper.   The fact that the conversation took place after the inception of the paper and while the parties were negotiating for a renewal or protection, makes it none the less a part of the *res gestæ.* That paper was the subject of negotiation, and declarations concerning it during such negotiations were part of the *res gestæ.*

With regard to the other two matters, these things should be noticed. They were not mere volunteer statements, made irrespective of any act and resting for their value simply on the fact of the declaration, but they accompanied certain acts which they qualified and explained. If, therefore, the acts themselves were competent testimony, the accompanying declarations also were. Now would not a list of the company's debts made by the officers and managers be proper evidence that one included in such list was in fact a debt of the company?

Again, both W. E. and C. C. Hutchinson were witnesses on the trial—the latter, it is true, testifying only by deposition, but the former was present on the witness stand. The attention of W. E. Hutchinson was called to the list and his declarations, and such explanations as he had to make were given. Now would not the reverse order of inquiry have been unquestionably proper, i. e., if he had on his direct examination testified that this was not the company's debt, to have asked him if he had not used a list showing this to be one of the company's debts, and so stated to parties to whom he had shown the list? This might have been simply impeaching testimony, and given him an opportunity for denial or explanation. The opportunity he in fact had, and the explanation he desired to give, was given. Now even if the testimony was not strictly competent as direct and original evidence, was the order and manner of its admission such an error as compels a reversal?

Again, when a party is not merely agent and officer, but substantially the owner and principal, and in fact the general manager, (as in this case C. C. H., the owner of 496 out of 500 shares,) courts may fairly open a wider door to the admission of the statements of such party. Technically, he is not the party to the suit, the nominal defendant, but he is so nearly the real party in interest, that what he says comes almost up to an admission of the defendant. We would not ignore the distinction between corporation and stockholder, principal and agent, nor disregard the rule that the declara-

tions of one, who is merely an agent, bind the principal only when made pending the act in respect to which he is agent, or, as the phrase is, *dum fervet opus;* yet having regard to substance and real ownership, we are not prepared to hold that here there was such a disregard of the rule as compels us to reverse the judgment. (*Durham v. C. C. & M. Co.*, 22 Kas. 232.) If an admission against interest is good against the party making it, an admission by the owner of 496 out of 500 shares in a corporation binds nearly all the property interests represented by the corporation.

Again, a corporation, like an individual, may ratify unauthorized acts of its agents. And how can such ratification be shown? May it not be by evidence of the acts and statements of its directors, its managing officers, which imply and assert that the act is a company act, or adopted and recognized by it as such? How can a corporation make a showing of its indebtedness except as such showing is made by its officers, and if the showing is made by them, is it not evidence against the corporation? Here, a list of debts is prepared with the knowledge of a majority of the directors (for the two Hutchinsons made a majority), for the purpose of aiding in negotiating a sale and used in such negotiations. Would an entry ordered by these two directors to be placed on the records of the corporation be stronger evidence than a list made under their direction and used by them?

We are aware that the suggestions we have made might not be appropriate in many cases, and where the relations of the parties. to the corporation were different from those of the Hutchinsons to the defendant, but in this case, taking all the circumstances together, we cannot think the defendant suffered any substantial wrong by their admission. So far as the instructions are concerned, we think they fairly presented the law to the jury. We see none requiring special notice.

We have examined this record with care, and upon the whole case, we do not think any substantial error was committed to the prejudice of the plaintiff in error. The judgment will therefore be affirmed.

All the Justices concurring.